**FILED**

**NOV 3 0 2006**

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | Criminal No. 06-274 SEALED |
| v. | : | |
| | : | VIOLATIONS: |
| **ROBERT S. PARSLEY,** | : | |
| | : | 18 U.S.C. § 1505 (Obstruction of Justice); |
| **Defendant.** | : | 18 U.S.C. § 2 (Aiding and Abetting) |

**STATEMENT OF THE OFFENSE**

Pursuant to Fed.R.Cr.P. 11, defendant ROBERT S. PARSLEY agrees and stipulates as follows:

1. Marc Duchesne was a citizen of the United Kingdom and resided in Houston, Texas.

2. Nationwide Capital Corporation ("Nationwide") was a Nevada corporation with offices in Houston, Texas which had de minimus assets and revenues and virtually no business operations. In July 2002, Nationwide merged with Calwest Ventures Inc. ("Calwest"), a publicly traded "shell" company which also had no significant assets, income or business. The merger of Nationwide and Calwest occurred after Duchesne and others had purchased virtually all of the outstanding shares of Calwest. At the conclusion of the merger, the surviving entity was Nationwide Capital Corporation.

3. After the merger, Nationwide became a publicly traded company under the symbol "NCCN." Nationwide had common stock registered with the United States Securities and Exchange Commission ("SEC") under the Securities Act of 1933, and from on or about August 16, 2002, through on or about October 1, 2002, the common stock of Nationwide traded on the electronic bulletin board system (the "OTC Bulletin Board") maintained by the National

Association of Securities Dealers (the "NASD"). Nationwide was required by law to file with the SEC truthful statements regarding its business affairs, including periodic reports on its financial condition and operations. On October 1, 2002, the SEC suspended trading in Nationwide securities until October 15, 2002, citing questions about statements made by Nationwide concerning its business operations, business relationships, financial condition and its acquisition of another company.

4. G.M. was a resident of Houston, Texas and was the President and Chief Executive Officer of Nationwide.

5. J.M., a resident of Houston, Texas, was the President of the "Financial Services Division" of Nationwide.

6. ROBERT PARSLEY, a resident of Houston, Texas, was a commercial real estate broker. In or about June 2002, PARSLEY began to assist J.M., Duchesne and others associated with Nationwide with finding commercial office space for Nationwide.

7. The SEC was an agency of the United States located at 450 5th Street, N.W., Washington, D.C. and was responsible for protecting investors and maintaining the integrity of the securities markets. As such, the SEC had regulatory and civil enforcement authority over companies such as Nationwide, whose securities were traded on the OTC Bulletin Board, as well as the officers, directors, and employees of such companies, such as G.M. and J.M.

8. After Nationwide common shares began trading on August 16, 2002, and with the assistance of others, Duchesne devised several schemes to manipulate Nationwide's stock price.

9. As described below, Duchesne, G.M., ROBERT PARSLEY and others conspired to and did manipulate Nationwide's stock price by, among other things, coordinating several

prearranged trades and "matched orders" (that is, securities purchases or sales entered with the knowledge that a reciprocal order of substantially the same amount would be entered at substantially the same time for substantially the same price) that were designed to create a false and misleading appearance of an active and rising market in Nationwide stock and to induce others to purchase Nationwide shares at artificially inflated prices.

### Creation of Nationwide and Commencement of Trading

10. On or about July 23, 2002, Duchesne, G.M. and others purchased the outstanding common stock of Calwest.

11. On or about August 6, 2002, Duchesne, G.M. and others changed Calwest's name to Nationwide.

12. On or about August 16, 2002, Duchesne, G.M. and others caused Nationwide common stock to became publicly traded on the OTC Bulletin Board under the ticker symbol "NCCN."

### Prearranged Trades

13. In or about August 2002, Duchesne, defendant PARSLEY and others conspired to and did unlawfully manipulate Nationwide's stock price by among other actions coordinating several prearranged trades and "matched orders" (that is, a securities purchase or sale entered with the knowledge that a reciprocal order of substantially the same amount would be entered at substantially the same time for substantially the same price) for the purpose of creating a false and misleading appearance of an active and rising market in Nationwide stock and to induce others to purchase shares of Nationwide stock at artificially inflated prices.

14. On or about August 29, 2002, Duchesne, with the intent to artificially inflate the

3

price of Nationwide stock, instructed ROBERT PARSLEY over the telephone to purchase Nationwide common stock in amounts and at prices dictated by Duchesne.

15.    On or about August 29, 2002, ROBERT PARSLEY, for the purpose of artificially inflating the price of Nationwide stock, telephoned his broker and caused him to buy a total of 800 shares of Nationwide common stock at prices ranging between $10.25 and $18.75 per share well knowing that said prices in no way reflected the actual value of Nationwide stock.

### The SEC Investigation

16.    Among other statutes, the SEC is responsible for enforcing the federal securities laws, including the Securities Exchange Act of 1934, 15 U.S.C. § 78, *et seq.*

17.    Beginning in or about 2002, the SEC commenced a proceeding and directed its staff to investigate whether Nationwide and others, directly or indirectly, in connection with the offer, purchase or sale of securities: (i) may have employed, or was employing, devices, schemes, or artifices to defraud; (ii) may have made, or was making, untrue statements of material facts; or may have omitted, or was omitting, to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and may have obtained, or was obtaining, money or property by means of such statements or omissions; or (iii) may have engaged in, or was engaging in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers or other persons through, among other things, company press releases, statements on the Internet web site, and other public statements concerning, among other things: (a) the company's business operations, (b) the company's business relationships, (c) the company's current financial condition, (d) the company's acquisition of YCO, a privately held company, and (e) trading in

the company's common stock by related shareholders.

18. As its investigation progressed, it was material to the SEC to determine, among other things, whether Duchesne, defendant PARSLEY and others had attempted to artificially increase the price of Nationwide common stock by prearranging trades of Nationwide stock by and between Duchesne, defendant PARSLEY and others.

19. On November 20, 2002, attorneys from the SEC's Division of Enforcement in Washington, D.C., contacted defendant PARSLEY by telephone and took his testimony under oath in the SEC's investigative proceedings. Defendant PARSLEY was informed of the SEC's investigation and took an oath to testify truthfully in connection with that investigation. Thereafter, defendant PARSLEY endeavored purposely to corruptly influence, obstruct and impede the SEC's investigation by providing the SEC with knowingly false testimony that no one, including Duchesne, ever told him the price at which he should buy Nationwide stock and that he could not remember how he decided how much Nationwide stock to purchase on August 29, 2002. Specifically, on November 20, 2002, defendant PARSLEY did state and subscribe the following underscored declarations that he knew were false and material to the SEC's investigation for the purpose of corruptly influencing, obstructing and impeding the SEC's investigation:

Question: Okay. Do you recall whether around the time that you were making the trades, like on the day, if you ever spoke to [Duchesne] on those days?

Answer: <u>I do not.</u>

Question: Okay. In other words on the day that you remember buying stock in Nationwide, do you also remember speaking to [Duchesne]?

Answer:      <u>I do not.</u>

Question:    Do you think you did?

Answer:      <u>I don't recall. I said I don't -- I don't think I did</u>.

Question:    Okay. Did anyone ever tell you at what price to buy Nationwide stock?

Answer:      <u>No.</u>

Question:    So what made you decide to buy Nationwide stock?

Answer:      Well, I think I told you. They told me it was going to be a good investment. The company was -- they were acquiring some companies. It was going to grow into a national company, and I decided to buy some stock in it because I thought it would go up in value.

Question:    And you said they told you, who do you --

Answer:      [J.M.].

Question:    Anyone else?

Answer:      No.

Question:    Okay. And did anyone ever suggest to you at what price you should buy stock?

Answer:      <u>No.</u> I was -- they told me I could call my stock broker and put in an order for the stock, and that's what I did.

Question:    I'm sorry, you said, "they" told you. Who --

Answer:      Let me go back. They, [J.M.].

*   *   *

Question:    Okay. I was just wondering, did [Duchesne] ever speak to you at what price you should buy the stock, or tell you what he thought a good price was?

Answer:      Not to my -- <u>no.</u>

*   *   *

6

Question:     How did you decide how much Nationwide stock you would buy on that day (August 29)?

Answer:     You know, I really don't remember that. I remember calling my broker and telling him to buy some stock, and, again, I don't remember the process. I don't really recall how I told him -- you know, how I told him to buy stock. I don't recall if he said, you know, there's 800 shares out there. There's a thousand shares, and a I said to buy 800. I don't really recall.

          Respectfully submitted,

          JEFFREY A. TAYLOR
          United States Attorney
          for the District of Columbia

By:     _____
          JONATHAN R. BARR
          Assistant U.S. Attorney
          D.C. Bar Number 437334
          555 4th Street, N.W.
          Washington, D.C. 20530
          (202) 514-4250

## DEFENDANT'S ACCEPTANCE

I have read every word of this Statement of Offense. Pursuant to Fed. R. Cr. P. 11, after consulting with my attorney, I agree and stipulate to this Statement of Offense.

Date: 11/30/06

_____
Robert S. Parsley
Defendant

I have discussed this Statement of Offense with my client, Mr. Parsley. I concur with his decision to stipulate to this Statement of Offense.

Date: 11/30/06

_____
Scott L. Fredericksen, Esquire
Attorney for Robert S. Parsley

Date: 11/30/06

_____
Gregory S. Bruch, Esquire
Attorney for Robert S. Parsley